*488a Opinion of
Judge Whyte
delivered in the foregoing case. This was an action of ejectment brought in the court below on the 29th July 1825, verdict for the defendants and an appeal in error to this court. The bill of exceptions shewed that the plaintiff claimed title to the land by a grant from North Carolina for 5000 acres dated the 1st January 1783, which called to begin on the south west corner of Davidson’s tract of5000 acres to run east, and then south, &c.
Davidson had an old entry and survey which was granted by Tennessee in 1820.
An old marked corner for the beginning of Davidson’s as well as for the south west corner and beginning of the plaintiff’s grant, was lound in Maury county according to the calls in 1806; no actual survey of plaintiff’s land was made prior to 1806, further than marking the tree above mentioned, which was the beginning corner of plaintiff’s grant, and marked for the south west corner of Davidson’s.
Jn 1806, the ancestor of the plaintiffs employed a surveyor to run out and mark his land. The surveyor accompanied James Houston, who was the ancestor of the plaintiffs, and the claimant in 1806 commenced a re-survey at the above mentioned south west corner of Davidson, being the beginning of Houston’s grant, and, reversing the calls of the grant, and run first south &c., on running out the distance of that line as called for in the grant, the surveyor made a stop and informed Houston, the grantee, of the fact. Houston enquired of the surveyor if the old grants in the neighborhood were not found to contain an excess of land on account of the lines being longer in fact than called for, and what that excess generally was; on being informed that the fact was so, and that generally there was a certain quantity of excess, Houston insisted on the surveyor that he was as much entitled to excess as others, and required him to extend the lines as much further as would include the usual excess. The surveyor being employed as a private man by the day, and not being a public sui'veyor, obeyed Houston’s directions, extended the line sixty polos and ran east, giving that line a propor *488b tional excess, then north the same distance as the first an¿ wes¿ t0 the beginning. These lines were marked, and Houston thenceforth while he lived, and his heirs, the plaintiffs, claimed up to that line.
Houston and Davidson had agreed upon the dividing line between them according to the running, and had sold land on their respective sides of the line up to the same; and in a controversy which arose about this dividing line, the same was established by the judgment of the supreme court according to their agreement.
After the running and marking of 1806, several persons leased or rented of Houston and acknowledged his title until 1814, when one Brackenridge run the land by order of court, so as to exclude these tenants, or one of them, from which time one of them refused to pay rent. Houston brought an ejectment against some or all of these tenants and failed in the action, but on some collateral point the merits of this controversy were not tried in that ejectment.
Dobbins run out and processioned the two claims, (Davidson and Houston,) at the request of the claimants, under the processioning act of 1819, c. 1 s.7,8, being the deputy of the principal surveyor of the district and, according to his running or re-survey, the defendants were excluded; he ran the land according to the mode hereafter mentioned in the charge of the court as the legal mode, but this mode of running was objected to by the plaintiffs at the time, who wanted him to run by the marked trees of the survey made in 1806 by Porter.
The defendants claim under occupant entries made un-dei the law of 1819 by virtue of the possession of some of the same persons who had been tenants of Houston as well as some other persons, — and are included within the marked lines of Porter’s survey of 1806. Silas Alexander, a witness for defendants, testified, that he had lived 20 years on Houston’s tract of land, and that Porter in 1806 run three of Davidson’s lines, that there were no old marks in Davidson’s east boundary. That th south boundary of Davidson was considered an open line. That *488c Brackenridge, about the year 1814, surveyed Houston^ " , /> i ,.it tract of land by an order of court, began at the Locust, Davidson’s beginning, ran east to a corner, then south, finding no line it was believed that line was open; Brack-enridge, in this east boundary of Davidson, stopped at the end of the distance, made some signs, though he marked no corner. He then run south to find Houston’s south east corner. In running this line no old marks were found or spoken of except Porter’s. Upon these facts the court below charged the jury. First, that the correct' method to have run and ascertained the lines of Houston’s grant in 1806 was, to have run Davidson’s tract from the beginning corner east, to the white oak, the north east corner, and then to have run south with the same variation which was found in the first line the distance called for in his survey, which would be his south east corner, then a straight line to his marked south east corner, which would be Davidson’s south boundary, and Houston’s north boundary, then to have run from Davidson’s south east corner so ascertained, south with the same variation the distance called for in Houston’s grant, and then west with the same variation; and if the lines thus run included the defendants, the plaintiffs should have a verdict.
This first part of the charge of the court being excepted to, as well as the second part that follows, — the first part will be first noticed before I proceed to the second part, as they depend on different principles. The judge says, the correct method to have run and ascertained the lines of Houston’s grant in 1806, was to have run Davidson’s tract from the beginning corner, east to the white oak; why should this have been done ? Why should Davidson’s tract have been run at all? It would only have been necessary to have run Davidson’s tract for the purpose of enabling the surveyor to run Houston’s grant, which, not being necessary, and in no wise required, the directions were improper, as it’would necessarily have the effect of attaching a kind of' dependence of the locality of Houston’s grant upon Davidson’s survey, which neither the fuel of the case, or the law upon these facts do justify. — ’ *488d To run Davidson’s tract first from 'his beginning corner east, would only have been charged as the correct method upon a state of facts, that Houston’s beginning being Davidson’s south west corner, had not before been, and was not then identified and known as such, to wit: in 1806, for if Davidson’s south west comer was then known, and it being the only bond of connexion, by the facts proved between the survey of the one, and the grant to the other, a further reference to Davidson’s survey, was, at the least,introductive of irrelevant matter, not applicable to' the case, and leading to confusion. But in 1806, we find the contrary to such case; Porter says, that in July 1806, he was called upon by James Houston to run out, or survey the land described in his grant; that he, and Houston and others went to Davidson’s corner, the beginning of Houston’s grant. This beginning was an old marked corner, that he commenced at it, and running with the variation he had found in the old lines of the same neighborhood, that is, running the last line first, went south the number of poles called for in said grant. As we find from this testimony there was no difficulty in finding Davidson’s southwest corner and Houston’s beginning, there was no occasion for recourse to the method pointed out by the charge; and, therefore, such method was not adopted; they went to it readily as to a point well known for any thing either appearing, or being implied to-the contrary, and run Houston’s grant as stated: first south or reversing the old lines. But the incorrectness of this charge, in stating it as the correct method to have run out Houston’s grant, was, to have run Davidson’s tract from his beginning, L. L. consists not alone in the presentation of irrelevant, and improper matter to the jury that might mislead them; but of the inference, expressly drawn by the judge, after having traced Davidson’s lines to his south west corner, which is the beginning of Houston’s grant, that is: he lays it down as a conclusion from the premises mentioned by him, that running from Davidson’s south east corner a straight line to his marked south west corner, would be Davidson’s south boundary, and Houston’s north boundary. A line from Da *488e vidson’s south cast corner to his marked south west cor-nor, may be the south boundary of Davidson’s tract, hut it cannot be the north boundary of Houston’s grant, upon the facts set forth in this record. These facts shew that the second line oí Davidson’s survey, or its eastern boundary, is not a marked line; no marked trees were found in it; the evidence is that it was considered an open line; there was no marked corner tree found, and it was terminated at the end of the distance called for, as the point, for the south east corner of the survey; from this south east corner so made, a straight line is run to the marked hickory, the south west corner; no marked trees are found in this line. By the evidence it was also always considered an open line. By the charge of the judge, this line sustains the double character of being the south boundary of Davidson’s survey and north boundary of Houston’s grant. It cannot sustain the latter, because its course to the hickory or south west corner of Davidson’s survey, is not due west according to the cardinal point, which must be the course of Houston’s north boundary. Houston’s grant says, beginning at a hickory and ash near the top of a ridge, John Davidson’s south west corner, runs east with said Davidson’s line, east 285 chains to his south east corner; the record shews that there is a repugnancy between an east course, and the course of Davidson’s line; the question is which shall prevail. The rules established for the settlement of boundary cases must decide.— In 1st Haywood N. C. Reports 377, Beatty’s case, it is laid down, if a course and distance is called for, and there is no marked line or natural boundary, that course and distance must be pursued, and the line must terminate when that distance,in the course called for, is completed; but if a course and distance be called for, and there be a marked line and corner variant from that course, which is proven to be the line made by the surveyor as a boundary, then that marked line shall be pursued. This authority meets the present case precisely; in it a course and distance is called for, east 285 chains, but there is no marked line; the course and distance, therefore,must be *488f pursued. In the same book the case of Bradford vs. Hill, page 22, is to the same effect. The general rule for the making surveys of land is prescribed by the act of assem-0f November 1777, ch. 1, sec. 10; — it requires “that evei7 survey shall be bounded by natural boundaries or right lines, running east, west, north and south, and shall be an exact square or oblong, the length not exceeding double the breadth; unless when such lines interfere with lands already granted or surveyed,” 2 Scott 1G2. A deviation from the principle of this rule is permitted in favor of lines actually marked and proved to be the lines of the survey, though variant from the course called for, as in Beatty’s case above cited, and in M’Nairy vs. Hightower, 2 Ten. Rep. 304, where judge Overton lays down the law to be, when lines are actually marked, though varying from the course, then the course must be abandoned.” These cases prove that there is error in the charge of the court, as the line called for, to wit: Davidson’s line is not a marked line, nor is his south east corner, which is called for as terminating that line, a marked tree or corner; and, therefore, such line cannot control the east course of the grant to Houston, draw it from the cardinal point there called for, identify with itself and so constitute with the same locality the north boundary of Houston’s grant, and the south boundary of Davidson’s survey. From the error in the charge of the court in fixing the north boundary of Houston’s grant upon the south boundary of Davidson’s survey, it follows, of course, that there is error in the direction which commences Houston’s east boundary line, at the south east corner of Davidson’s survey, so ascertained, instead of a point cast from Houston’s beginning, the hickory.
The second part of the charge of the court is as follows: “If Porter, at the request of Houston, and in company with him, went on the land in 1806, and honestly wishing to mark off Houston’s land correctly, and if Houston desired him so to do, and Porter actually did begin at the hickory, and run south and east and north so as to include the land which Houston did believe to be his own, and *488g Porter plainly marked the lines and corners as such bouu-dary, and reasonably conforming with the calls of the grant, then, although these lines were not made in strict conformity to the lav/, yet they shall stand, and the marking by Porter in 1806 shall give validity to the boundary against subsequent enterers; but if in running these lines in 1806 they or any of them were extended by Houston or with his consent incorrectly, or so as to include land-which Houston knew or believed to be vacant, then such incorrect running would have been a fraud upon the state, and consequently void. The jury were charged to [ deliberate and consider whether from the evidence before them they believed those boundaries of Houston’s grant so made by Porter were marked out and measured honestly, in good faith, and reasonably conforming to the calls of the grant, or were they run by Houston’s directions incorrectly, and to include land which he at that time believed to be vacant. If the jury should find the former, and if the defendants were possessed of lands within those lines so marked, the verdict should be for the plaintill; but if they found the latter, then the verdict should be for the defendants.
This part of the charge discloses the nature of this case, and brings forward the proper question to be examined by this court for obtaining a correct decision -of the cause. That question is, whether the survey made by Porter in 1806, under Houston’s grant, has a reasonable conformity with the grant or not.
This is one of that class of cases called re-marking cases, which have so often been before this court. I have, in those which have been decided, so fully expressed myself on the principles by which they are governed and determined, that I had hoped it would not be necessary for me to say any thing further on the subject; especially as the counsel in this cause have on both sides professed to be perfectly satisfied with all the decisions heretofore made on the subject of re-marking, and that they contend for nothing in opposition to, or conflicting with any one decision that hath been, made. But notwithstanding this union of *488h acquiescence in the decisions already made, the results of their arguments, each claiming the support and protection of these decisions, are as widely differing as the sides they respectively espouse.
The principles upon which these re-marking cases rest, are fully stated, laid down and explained in the first of them that is reported, to wit: the case of Williamson’s heirs vs. Robert Buchannan, 2 Ten. Rep. 278. It is a leading case, and has been followed in all the subsequent cases.— The great governing principle is, to support, if possible, the grant. At the time this case was decided, this supreme court consisted of two members; one of them says, in no case should a grantbe void for uncertainty, if by any reasonable shift or contrivance, it can be fixed to a given spot and its boundaries ascertained. The other member of the court says, when we perceive the efforts which have been made by the courts in every country to prevent the destruction of contracts by uncertainty, particularly as respects locality and boundaries of land granted, no doubt can be entertained that the state will not be suffered to dispute the red oak corner. This leading principle of decision in our land cases has led to the establishment of others, being founded in our land laws, as that in every grant for land, the land has been surveyed before the issuing of the grant, whether in point of fact it has been so or not. That the grant covers and protects the survey, and that the proof of the survey is proof of the locality of the grant. These and the like are presumptious inferences and deductions of law which are not to be controverted. Pursuant to these principles, and as a consequence resulting from them, it is admitted, and by a course of decision established, that notwithstanding a regular surveyor, appointed by the authority of the government, is the proper officer to make the surveys of land on which grants under our land laws issue to the grantees, and the execution of every grant imparts such fact; yet that a survey made in truth,and so proved to be made by another person, not the officer of the government, but a private individual, will be as good and as valid, under some circum *488i stances, as if made by the proper officer; nay, the decis* „ /» -, t i t i ,i , i . . ions go farther and nold9 that under circumstances a survey made by grantee himself, or other party in interest, Is as good and available to all intents and purposes as if made by the proper officer, provided, it be made conformable to the calls of the grant or reasonably so. Not intending to take a review of the cases on re-marking, decided heretofore by this court, by a particular reference to them, a part of which the counsel have cited at length on the argument, I have made the above short extract from the principles which have guided, directed and controlled those decisions, and which of course must have the same influence and action on the determination of the present case now before this court, as it is a matter of the utmost importance that rules of property should be uniform and, more especially, those, that vitally affect the landed interest of the country.
Is Porter’s survey of Houston’s grant a valid location of it? This is the principal question. It is admitted on both sides that no actual survey was made of Houston’s grant before its issuing, and that Porter’s survey in the year 1806, is its first survey, — Porter’s survey being established as the first survey; it is sufficiently identified upon the principles laid down and established in the cases cited upon the argument. It is proved by marked trees all round, made and marked in 1806, which still exist, and are so known and called by one or more subsequent en-terer or enterers. If the survey is thus marked on the ground, what is the intendment of law? it is this, that if a survey was actually made before the issuing of the grant, that the marks now proved existing, is a re-marking the original survey according to both its coursesand distances; the marked lines and corners of which original survey, are now become extinct by time and accident. This survey of Porter, possessing the requisites of priority and identity, what further requisite is necessary to the constitution of its validity. It is necessary farther under the decisions made, that it' should also have a reasonale conformity to the calls of the grant. Houston’s grant, or Sleese’s grant, calls, beginning at a hickory and ash near *488k the top of a ridge, John Davidson’s south west corner, rung eas£ with said Davidson’s line, 285 chains to his south east corner, thence south 175 chains 50 links to a linn and sugar tree, thence west 285 chains to an ash, thence north 175 chains 50 links to the beginning. Porter’s survey begins at the beginning called for in the grant, but runs south instead of running east, reversing the running or courses called for in the grant, and running with the variation he had found on the old lines in the same neighbourhood; but he ran the lines longer than what was called for in the grant, allowing an excess of 60 poles at the end of the first line, being the excess found in Davidson’s, and most of the old surveys in the neighbour-hood ; he ran the second and third lines in the same proportion to the first line; when he had run the third line the same length he had ran the first, he found himself at a point 40 yards north, and 81 yards east, from which point he found a line newly marked, apparently the same year, which he believed then to be Davidson’s south boundary line, which is the same that Davidson and Houston sold and conveyed to, and was afterwards established by the supreme court.
These are the circumstances of the survey; is it in reasonable conformity with the grant? It covers the same land on the face of the country, that a survey at the present day, under the grant, would cover, but the objection is, that it covers to much; it is true that it covers more than the distances in the lines of the grant amount to, and more than a survey now made would in all probability contain; but it cannot be said that it contains more than old surveys under the like old grants contain. It is to be observed, that in those early times of the settlement of this country when the plaintiff’s grant issued, land was comparatively of little value to what it is at the present time; and that the scale of precision in admeasurement, in reference to quantity, was not applied to surveys then made, — such was not the usage of the times; and, notwithstanding the excess in quantity, no instance of complaint is remembered to have been made by the grantor; the slate of this practice, which so continued if it could be *488l considered in any any wise reprehensible under the cir-cumstanccs of those times, until it reformed itself by a different comparative relation between the fund and the demand for it. This state of things had not arrived in 1806, when this re-survey, or re-marking was made by Houston and Porter, for we then find much vacant land in the neighborhood. No attempt was ever made to curtail a survey of granted land previous to the execution of this survey by Porter; it was indeed soon afterwards by the act of 1806, ch. 1, sec. 20, but the state of society was unprepared for it; and it accordingly underwent a repeal the following session of the legislature in 1807.— How many instances may be found in this state, of grants holding lands under survey containing an excess beyond the quantity called for; which excess is vastly greater, in proportion to the quantity called for in the grant, than that in the present case, and is one to be found that has ever been cut down altogether or even curtailed on this ground? The answer must be not one. It is apposite on the present point to cite the opinion of Judge Overton, of whom the least that can be said, is, that no lawyer in this state is more conversant with its land laws, and the decisions under them than he is. In the case of Philips vs. Robertson, 2 Ten. Rep. he says: “by law a latitude is allowed in the survey or it is not;it has been shewn from the practice, the spirit of the statutes, and precedents that it is allowed; and no case, though there have been many, has ever been decided otherwise.” Therefore, from the general usage of surveys containing an excess of land beyond the quantity called for by its grant, un-complained of by the party interested to the contrary, the state; and the continuance of that usage after the issuance of Reese’s grant, and the legislative sanction to the validity of such grants, and the surveys of them, by repealing and rendering abortive the attempt made by the provision of the act of 1806, to curtail this excess, and the other facts set forth in the record and not necessary to be here again repeated, I am of opinion, that this court cannot say otherwise than that Porter’s survey is in reasonable conformity with Reese’s grant, and the circuit *488m court ought to have so said to the jury; for the question, whether a survey is in reasonable conformity with the calls of a grant, is a question that ought not to have been left to the jury to decide, being matter of law, that should have been passed upon by the court, and its judgment thereon given in charge to the jury, to direct their verdict. There was no contest in the present case about the facts given in evidence; they are stated by the court in delivering its charge. The court should have told the jury, if they found the testimony true, and the facts tobe as therein stated, that the judgment of law upon them was, that the survey had a reasonable conformity with the calls of the grant; or viceversa, that it had no such reasonable conformity.
The remaining part of the charge not yet noticed, respects the question of fraud as applicable to the survey. In examining it, three things are to be considered. 1st. Whether the survey on the grounds taken, and for the reason stated, can be deemed fraudulent. 2d. If fraudulent, can the fraud be imputed to these defendants. — And 3dly. Is fraud a question of law to be determined by the court, or a question of fact tobe found by the jury.
As to the first, it is admitted by the defendant’s counsel, that this case presents the first instance of the exception of fraud being taken to the validity of a survey and grant, with a judicial notice of it by the court, in this state. It is a question of much importance, as it is introductory of a defence upon trials in ejectment, hitherto in cases like the present not only unpractised but even unheard of in our courts; and,if sustainable, must be productive of much litigation from its new discovered source of undermining old titles, and long quieted possessions, which is apparent from the well known fact, that hundreds of the old grants of this state are liable to the same exceptions, on the same ground. That ground is the excess of quantity beyond the call of the grant or survey. The view the Legislature have taken on this point, commands the attention of this court, and must give the basis upon which its opinion is founded. When the subject was before them, making it the express matter of legislation in 1806 and *488n 1807, they say in the first of these acts ch. 1, sec. 20— that it shall be the duty of every principal surveyor, or deputy when executing the duties by this act required, for ascertaining the existing claims within this state, if it shall appear to him or them, or informed by any other person, that there is contained in any survey or grant heretofore issued, more land than the said survey or grant mentions, a re-survey of such land is to be made, and if the latter survey does not exceed the former by more than ten acres in the hundred, such shall not be deemed an error; and if more land is contained therein than ten acres in the hundred, it shall be in the choice of the owner or claimant, to locate the same by legal warrants as in other cases of talcing up vacant land, Provided, said' overplus does not exceed one fourth part of the contents of the original tract, when the overplus exceeds one fourth part of the grant, the residue shall be adjudged vacant; and provided also, lhat the same be entered with the principal surveyor within three months after the office opened, or re-survey made &c. &c.
This section lays down the scale for the graduation of the overplus or excess of land beyond what is mentioned in the survey or grant, gives to it its character, and makes a disposal of it. If this excess was not more than.ten acres in the hundred, all was right, and the act bad no operation on it; but if that limit was exceeded then the excess was considered an error subject to redress, and if its amount did not reach beyond a one fourth part of the contents of the original tract, the grantee or his assignee was still to be considered the owner, by his entry of it on legal warrants, made within three months after office opened, or re-survey made; and such grantee is only divested of that character, by his own free will, in throwing it out according to the act; or, by his neglect of entering it, as above stated, either of which makes the excess vacant land and subject to general appropriation, but himself not excluded from this common privilege.
Such is the view of the state taken by her representative, the legislature, of all surveys and grants, existing previous to the passage of the acl of 1806, which contain *488o more land than the quantity mentioned in them; and how different is her view from the view taken upon the trial in the circuit court. She imputes no fraud to any excess " of any extent, she calls not in question the purity of mo^ve’ or honest intention, in the surveyor or locator; she singly enquires into the fact of excess, and upon finding it existing, she applies the remedy according to its extent. That extent in the present case, by the testimony of the surveyor in adding 60 poles to the western boundary line, and to the others in the same proportion, is, 890 acres; a quantum embraced by the middle division of the scale of graduation laid down by the act, that is, between the ten per cent, line, 500 acres, and the one fourth of the contents of the original tract line, or 1225 acres, which division is characterized as error, not fraud, and its redress not visited by the consequences of a fraud, the rendering the grant void, hut by payment for the excess.
With this act of assembly in our statute book it becomes the duty of this court to consider, whether, upon the powers of the court, acting within its proper province, it can change the character oí a transaction which has received its impress from the legislature, acting upon that transaction by direct enactment, making provisions agreeably to, and comporting with the nature of such character so given to it. My opinion is it cannot; that this act of 1806, as to this point, is repealed by the act of 1807, takes nothing from the force and efficacy of the former in its application to this question, but adds to it. The act of 1806 proves, that the legislature would not consider excess of quantity of land, covered by surveys and grants beyond what was mentioned in them, as fraudulent, but only that when such excess went beyond ten acres in the hundred it should be deemed erroneous. The repeal shows that the legislature of 1807 would not go that far, or admit that such excess should be deemed any error. No doubt, founding themselves upon the impolicy of such a measure, in changing the law embracing, and protecting the most valuable interest of the whole community, its landed property; and upon its injustice in violating the contracts of men, injuring bona fide purchasers for valuable considera *488p tion,who had acquired rights, and made purchases, agreeably to the actual contents covered by the grant and survey, and not according to the nominal contents expressed upon their face. The attempt, therefore, to attach fraud to a survey or grant because that they contain a greater quantity of land, than that mentioned on their face, which constitutes the principal objection insisted on by the defendants to the recovery of the plaintiff, is completely repudiated by the authority of these acts of 1806 and 1807, as, likewise, the ground on which that objection is attempted to be raised,namely, that the excess was made designedly and with knowledge; for the government, in the view above taken of excess beyond the quantity called for, makes no enquiry of, how, by what means or with what intentionit is made,impliedly deemingitunimportant; but only enquires into the single fact of its existence. That surplus land, or excess of quantity beyond what is called for in an entry or grant,is contained in the survey, is either erroneous, orfraudulent,is not a principle in the general land law of the state. The attempt to ingraft the former into it, in 1808, was repealed as soon as it was possible to do so, that is, by the next legislature, and no such attempt was made as to the latter. If, however, error and fraud could be alleged and proved in such case in any mode, that mode cannot be by a trial in ejectment; to permit it at law requires the special authority of a statute for that purpose, for which some cases will be cited presently.
The question of appropriating by survey a greater quantity of land than called for by the warrant or entry, the licence or authority for this appropriation, has come before the judiciary of the neighboring states, of Virginia in the case of Johnson vs. Buffington, 2 Wash. Rep. 116, and of Kentucky, in the case of Taylor and Quarles vs. Brown. This last case by writ of error came up to the supreme court of the United States, 5 Cranch 234, in which these decisions in their respective courts are stated and observed upon by chief justice Marshal, in delivering the opinion of the supreme court; which supersedes the neressity of reference to the original reports of them.— Taylor and Quarles, the complainants, claimed under M’ *488q Donald, who had the younger warrant and grant, but the elder survey. Brown claimed under Sumner, who had the older warrant and grant, but the younger survey, the ^ wrrrants were each for 2000 acres; the survey of M’Don-included 3025 acres; Sumner’s 2576 acres. The quantity covered by both surveys was 1080 of which Taylor claimed 660, and Quarles 200, it did not appear who claimed the other 220.
The complainants bill charged the survey of Sumner was fraudulently made, so as to interfere with M’Donald’s. The answer denies fraud and there was no evidence of it or even of notice on the part of Sumner.
With other exceptions taken to the complainant’s recovery, it was insisted for the defendant, Brown, that the suryey of M’Donald was void, as to the surplus beyond the 2000 acres authorized by the warrant; as to this surplus, M’Donald was a mere volunteer, he paid no consideration; it was a fraud upon the state, and could give no title in equity.
Chief Justice Marshal, who observed at length on this point in the case, as well as another,says: “In conformity with this opinion is that if the judges ofKentucky; nota case exists, so far as the court is informed, in which, in a caveat, the quantity of land in the survey of the plaintiff or defendant, has been considered as affecting the title upon the principle of surplus. Yet the fact must have often occurred, and in the case of Becldy vs. Bryan and Ransdali, it is expressly laid down by the court, who say, it is proper to premise, that there is but one species of cases, in which any court of justice is authorized by our land law to divest the owners of a survey of the surplus within its boundaries, namely, where the survey has been made posterior to an entry made by another person on the same land, and to do more would be unequal and unjust, inasmuch, as a survey which is too small cannot be enlarged.
In continuation he says, the opinion delivered by the judges of appeals in Virginia, in the case of Johnson vs. Buffington, 2 Wat. 116, would incline this court very much to the opinion, that the same rule prevailed in the counsel chamber before the revolution. In that case, un- *488r tier a warrant from Lord Fairfax for 300 acres of land, 450 had been surveyed, and the excess appeared on the plat. This survey had lain in the office many years, and was clearly forfeitable; but Lord Halifax had not taken advantage of the forfeiture; after his death a patent issued on a subsequent entry and survey, and the patentee was decreed to convey to the person claiming under the prior entry. In delivering his opinion Judge Fleming said, the first objection made by the counsel for the appellant is, that the survey does not pursue the warrant; but I think that there is no right in this, as the variance is only in the quantity. If the land had been imperfectly described, it might have been fatal. Judge Carring-ton said: “He did not consider the variance between the warrant and survey, as to the quantity, as being of any consequence. The President who had been an eminent practitioner in the counsel chamber said he felt no difficulty about the variance.”
Chief Justice Marshal, proceeding says: “The rules established by Lord Fairfax were known to conform to those of the crown; and the declaration of the Judges in this case, all of whom were acquainted, in some degree, with the usages under the regal government, make a strong impression on this court in favour of the opinion, that in the counsel chamber, the law was understood to be that excess in the survey was not to be regarded.”
In this case in Cranch, Chief Justice Marsha] has traced this question on excess in a survey up to its source, and found the law upon it to he, that the excess was not to be regarded; and it may be further remarked as deserving of notice that in the two cases observed upon by him, the one was fifty per cent, beyond the quantity called for, and in the other the excess was still greater, which excesses, though they seem great, compared with the excess in Houston’s grant, yet I apprehend, that if the records of the old grants of North Carolina located in this State, were looked into, the excesses in those two cases, would be found far from from being extreme cases.
The legislature of 1807 no doubt understood the law, respecting this matter, under the colonial government oí North Carolina to be the same as in Yirginia, and there *488s js much reason, in the absence of positive proof to the contrary, to induce a belief that this was the case, from their ^erivin§ governments and laws from the same source, from the contiguity of their territory, the great intercourse between their citizens, the approaching similarity oftheiracts of assembly, andno judicial opinion or reported case of North Carolina found indicating any thing otherwise. The legislature of 1807, therefore, refused to acquiesce in the innovation introduced by the act of 1806, and change the law as handed down to them by their ancestors.
Secondly. If this excess were fraudulent, can the fraud be imputed by these defendants; the case of Beckly vs. Bryan & Randsdale, above cited, is in direct opposition.— The defendants are the younger claimants from the State; the survey of Houston was made several years before their entries, and the land they cover appropriated by it. The land law only gives authority to enter vacant land; why therefore did these defendants interfere? in doing so, they acted without authority and against law.
But, suppose a grant from the state to be placed on the same footing with respect to the imputation of fraud, as a common conveyance between individuals, these defendants could not make it; for to have the power of defeating a former fraudulent conveyance, the party imputing it (the fraud) must be in by title in privity of estate from him who committed the fraud, — the maker of the fraudulent conveyance. In a grant from the state, if there is fraud, it is charged to the grantee as done at his instance; no fraud is charged upon the state; the state is passive in the transaction; the grantee is the actor, Reese or Houston, in the presentíase. Do these defendants stand by title in privity of estate to this grantee ? They are subsequent enterers to him by other and distinct entries, and different enterers are considered to be in of distinct rights; there is, therefore, no privity of estate between Reese and Thomas & Pillow, — the latter, Thomas & Pillow, being in of estates in rights wholly independent of, and distinct from that of the patentee, Reese, not having the power of defeating his grant on that ground. Roberts on fraudulent conveyances, 3, 85, 6, and cases cited. But supposing fraud in causing an excess to be made in a *488t survey be imputable in some form, can that be in a court of law in an action of ejectment. In the two cases above cited of Johnson vs. Buffington, and Taylor & Quarles vs. Brown, the charge was made not in ejectment, but by bill in equity, where the parties had notice oi the point to be contested, and an opportunity for preparation to meet it. Having already assigned my reasons why such an exception cannot be taken on a trial in ejectment in the case of Catron’s lessee vs. Lowery, in this court, 1818; 5 Hay. 165, and quoted the author in support to which I refer, therefore I shall not here state them again; but in addition, only cite two cases which have been reported since, on the point. The first is, Polk’s lessee vs. Wendall, 5 Wheat. 293. Mr. Justice Johnson, in delivering the opinion of the court, says: — “They have never expressed an inclination to let in inquiries into the frauds, irregularities, acts of negligence or of ignorance of the officers of government, prior to the issuing of the grant; but on the contrary, have expressed the opinion that the government must bear the consequences.” The other is, Patterson vs. Winn—Wheat. 380. Mr. Justice Thompson, who delivered the opinion of the court, says: — “We may therefore assume as the settled doctrine of this court, that if a patent is absolutely void upon its face, or the issuing thereof was without authority or was prohibited by statute, or the state had no title, it may be impeached collaterally in a' court of law, in an action of ejectment. But in general, other objections and defects complained of, must be put in issue in a regular course of pleadings on a direct proceeding to avoid the patent.” Thirdly: — Is fraud a question of law to be decided by the court, or a question of fact to be found by the jury ? Having already extended this opinion to a greater length than I wished or intended to do, I shall confine myself on this point barely to the stating the opinions of two late and most able Chief Justices of the court of King’s Bench in England, with the observation, that there are to be found in the books, obiter dicta of some Judges formerly to the contrary. But it is believed that no such recent opinion is now entertained or to be found. Lord Mansfield, in the case of Bright & Extor vs. Eynon, 1 Bur. Rep. 395, says: *488u “What circumstances and facts amount to such fraud or covin is always a question of law.” And Lord Ellenborough, in the case of Doe on the demise of Osley vs. Maning another, 9 East. Rep. 64, who delivered the judgment of the court of King’s Bench says: “for fraud and covin is always a question of law; it is the judgment of law upon facts and intents.” My opinion, therefore, is, that on the grounds and for the reasons above stated, there is error also in the second part of the charge of the Circuit Court in this cause.
1 have dwelt longer on this case than I otherwise would have done,in deference to the opinion of my brother Judge, who differed with me at a term before the present, in the case of Davis vs. Tarpley, which I have endeavored now to controvert in this opinion, — not having delivered my opinion in that case. Independent of that defence, after the best research I have been able to make, and the most mature deliberation within the compass of my very limited abilities to bestow on the subject, I cannot say that I have the least doubt on the question; and though very little weight may be due to this inferior opinion, yet I conceive in such a case it becomes my bounden duty to add my mite in support of the doctrine of re-marking as laid down by this court in the year 1814, and which has obtained ever since, though occasionally assailed in argument, — believing as 1 do, that its infringement in principle in the least, would be productive of the most mischievous consequences, in questioning the efficacy of old titles, unsettling the rules of real property that have long obtained, jeopardising possessions of the freehold — the most endeared rights and enjoyments belonging to an agricultural population. Such mischiefs must necessarily disturb the quiet of the country, its peace and harmony; all mankind, of every denomination, are therefore interestedin its being considered, that the doctrine agitated in the present cause is at rest, and cannot hereafter be disturbed.
The judgment of the Circuit Court ought be reversed, the verdict set aside, and the cause remanded to the Circuit Court for a new trial to be had therein, pursuant to the law as considered by this opinion.
Judgment affirmed.